1   CHAD C. COUCHOT, Bar No. 12946
    SCHUERING ZIMMERMAN & DOYLE, LLP
2   400 University Avenue
    Sacramento, California  95825-6502
3   (916) 567-0400
    FAX:  568-0400
4

5   KIM MANDELBAUM, Nevada Bar No. 318
    MANDELBAUM ELLERTON & ASSOCIATES
    2012 Hamilton Lane
6   Las Vegas, Nevada 89106
    Telephone:   (702) 367-1234
7   Facsimile:    (702) 367-1978

8   Attorneys for Defendants NAPHCARE, INC., LARRY WILLIAMSON, M.D., ARTHUR
    GALICIA, ELIZABETH AKHTAR, ELIZABETH ACEVEDO, DEBORAH CANTO,
9   DEBRA VANDERWAAG, REMIELYN MANDING, FREDERICK LAITA, ROCHELE
    PEOPLES, LAWANDA MCCLAIN, MICHELLE GONZALES, MARIAN MURRIEL,
10   MARINA ALBERTO, MESTAWOTE WILLIAMS, HORACE TADEO, AMANDA
    VERTNER, AND CRYSTAL GONZALEZ

11

12               IN THE UNITED STATES DISTRICT COURT
                     DISTRICT OF NEVADA

13

14   TONEY ANTHONY WHITE,         )  No.    2:16-cv-00734

15           Plaintiff,       )  **NAPHCARE   DEFENDANTS'**
                       )  **MOTION   TO   DISMISS   AND**
16   vs.                      )  **MOTION   FOR   SUMMARY**
                       )  **JUDGMENT**
17   COUNTY OF CLARK NEVADA (COCN), a )
    Municipality Incorporated under the State of )
18   Nevada;   NAPHCARE,   an   Alabama )
    Corporation qualified to do business in the )
19   State of Nevada; et al.,       )

20          Defendants.      )

21                              )

22                              )

23   _____)

24

25

26

27

28

  **NAPHCARE   DEFENDANTS'   MOTION   TO   DISMISS   AND   MOTION   FOR   SUMMARY**
  **JUDGMENT**

1

**TABLE OF CONTENTS**

2  I. INTRODUCTION...................................................................................1

3  II. FACTS...............................................................................................2

4  III. LEGAL STANDARD..........................................................................16

5       A.     Motion to Dismiss...................................................................16

6       B.     Motion for Summary Judgment............................................17

7  IV. LEGAL ARGUMENT REGARDING MOTION TO DISMISS...................17

8       A.     Plaintiff's Claims Against the LPN Defendants are
   Barred by the Statute of Limitations.....................................17

9            i.     Elizabeth Akhtar.......................................................18

10

11            ii.     Elizabeth Acevedo....................................................18

12            iii.     Deborah Canto..........................................................19

13            iv.     Debra Vanderwaag....................................................19

14            v.     Remielyn Manding....................................................19

15            vi.     Frederick Laita.........................................................19

16            vii.     Rochele Peoples.......................................................19

17            viii.     Lawanda McClain......................................................19

18            ix.     Michelle Gonzales.....................................................20

19            x.     Marian Murriel..........................................................20

20            xi.     Marina Alberto.........................................................20

21            xii.     Mestawote Williams..................................................20

22            xiii.     Amanda Vertner........................................................20

23            xiv.     Crystal Gonzalez.......................................................20

24  V. LEGAL ARGUMENT REGARDING MOTION FOR SUMMARY JUDGMENT........21

25       A.     Plaintiff Fails to Present Evidence to Support His
   First Amendment Retaliation Claim.......................................21

26            i.     Mr. Galicia Did Not Refuse to Process Plaintiff's
   Release of Information Forms...............................21

27

28

ii.      Any Injury Caused by the Alleged Five Day Delay in Processing the Release of Information Forms is De Minimus..........................................................................22

B.     Plaintiff Fails to Present Evidence to Support His Deliberate Indifference to Serious Medical Needs Claims.............24

      i.      Standard to Establish Deliberate Indifference to Serious Medical Needs.........................................................24

      ii.     Plaintiff's Allegations...............................................................25

      iii.    The Records from NaphCare Establish Plaintiff Received Appropriate and Objectively Reasonable Care........................................................................................26

      iv.    Plaintiff's Deposition Testimony Establishes There Was No Deliberate Indifference to Serious Medical Needs.......................................................................................27

C.     Plaintiff Fails to Present Evidence to Support His Fourteenth Amendment Due Process Claim...........................................28

D.     Plaintiff Fails to Present Evidence to Support His American with Disabilities Act and Rehabilitation Act Claims......................29

E.     All of the Care Plaintiff Received from Naphcare Was Within the Standard of Care......................................................30

F.     NaphCare Defendants Did Not Cause Any Injury to Plaintiff.............................................................................................30

VI.  CONCLUSION.................................................................................31

# TABLE OF AUTHORITIES

***Cases***

*Bell Atlantic Corp. v. Twombly*
550 U.S. 544 ................................................................................................ 16

*De La Cruz v. Tormey*
582 F.2d 45 .................................................................................................. 16

*Gordon v. Cty. of Orange*
888 F.3d 1118 .............................................................................................. 24

*Hamby v. Hammond*
821 F.3d 1085 ........................................................................................ 24, 25

*Jett v. Penner*
439 F.3d 1091 ........................................................................................ 24, 27

*Lopez v. Smith*
203 F.3d 1122 .............................................................................................. 24

*McGuckin* v. Smith
974 F.2d 1050 .............................................................................................. 24

*Mitchell v. Dupnik*
75 F.3d 517 .................................................................................................. 28

*Mitchell v. Horn*
318 F.3d 523 ................................................................................................ 22

*Oliver v. Keller*
289 F.3d 623 ................................................................................................ 22

*Portland Retail Druggists Association v. Kaiser Foundation Health Plan*
662 F.2d 641 ................................................................................................ 17

*Rhodes v. Robinson*
408 F.3d 559 ................................................................................................ 21

*Scott v. Harris*
550 U.S. 372 ................................................................................................ 17

*Securities and Exchange Commission v. Seaboard Corporation*
677 F.2d 1289 .............................................................................................. 17

*Shapley v. Nevada Bd. of State Prison Comm'rs*
766 F.2d 404 ................................................................................................ 30

*Toguchi v. Chung*
391 F.3d 1051 .............................................................................................. 24

*United States v. First National Bank of Circle*
652 F.2d 882 ................................................................................................ 17

*United States v. Georgia*
546 U.S. 151............................................................................................29

*Zoslaw v. MCA Distributing Corp.*
693 F.2d 870...........................................................................................17

*Zukle v. Regents of Univ. of California*
166 F.3d 1041.........................................................................................29

**Rules**

42 U.S.C. § 1983......................................................................................18

42 U.S.C. § 1997e(e)...........................................................................22, 23

FRCP 12(b)(6)...........................................................................................1

FRCP 56............................................................................................1, 17

Rule 15(c)(1)(C) .................................................................................18, 21

1     COME NOW Defendants ELIZABETH AKHTAR, ELIZABETH ACEVEDO,

2  DEBORAH CANTO, DEBRA VANDERWAAG, REMIELYN MANDING, FREDERICK

3  LAITA, ROCHELE PEOPLES, LAWANDA MCCLAIN, MICHELLE GONZALES, MARIAN

4  MURRIEL, MARINA ALBERTO, MESTAWOTE WILLIAMS, AMANDA VERTNER, AND

5  CRYSTAL GONZALEZ move to dismiss pursuant to FRCP 12(b)(6)on the grounds

6  that Plaintiff's claims are barred by the statute of limitations.

7     Further, NAPHCARE, INC., LARRY WILLIAMSON, M.D., ARTHUR GALICIA,

8  ELIZABETH AKHTAR, ELIZABETH ACEVEDO, DEBORAH CANTO, DEBRA

9  VANDERWAAG, REMIELYN MANDING, FREDERICK LAITA, ROCHELE PEOPLES,

10  LAWANDA MCCLAIN, MICHELLE GONZALES, MARIAN MURRIEL, MARINA

11  ALBERTO, MESTAWOTE WILLIAMS, HORACE TADEO, AMANDA VERTNER, AND

12  CRYSTAL GONZALEZ, move for summary judgment on all of the claims in the

13  Fourth Amended Complaint (FAC) pursuant to FRCP 56 on the following grounds:

14  1) none of Plaintiff's claims are supported by competent evidence; 2) all of the care

15  Plaintiff received from Defendants was within the standard of care; and 3)

16  Defendants did not cause Plaintiff any injury.

17     This motion combines both the motion to dismiss, and motion for summary

18  judgment, pursuant to order by the Honorable Richard Boulware II, during the

19  hearing on February 27, 2020.

20                    **I.    INTRODUCTION**

21     This case arises out of events that allegedly took place while Plaintiff Toney

22  White was incarcerated at the Henderson Detention Center (HDC) and the Clark

23  County Detention Center (CCDC). Defendants treated Plaintiff during his

24  incarceration at CCDC.

25     Following the Screening Order issued for the Third Amended Complaint

26  (TAC), Plaintiff was permitted to proceed with claims against Defendants alleging

27  retaliation, deliberate indifference to serious medical needs, a Fourteenth

28  Amendment due process violation, and violations of the Americans with

1    Disabilities Act and Rehabilitation Act.  (Screening Order on TAC, ECF No. 92).

2                              **II.    FACTS**[1]

3         On February 3, 2016, Barbara Thornton, an emergency medical technician,

4    performed a receiving screening of Plaintiff at CCDC. Plaintiff reported a history of

5    a seizure disorder and recent use of illegal drugs. He reported consuming 80

6    ounces of beer daily, and daily use of methamphetamine and heroin. Plaintiff

7    reported an allergy to Dilantin.  (Plaintiff's Medical Records from NaphCare Inc.

8    Exhibit A, pp. 138-141).

9         On February 3, 2016, Kristine Pagaduan, a registered nurse, performed a

10   physical assessment and a mental health screening. She noted Plaintiff had not

11   suffered any recent injuries. Plaintiff reported hearing loss in the right ear which

12   had been ongoing for some time. Plaintiff stated he was allergic to some

13   medications, but he did not know the names of the medications. He reported a

14   history of neck and back pain following a moped accident in September 2015. He

15   had taken hydrocodone for four months. He had last taken the medication on

16   January 22, 2016. (Exhibit A, pp. 125-137).

17        Plaintiff reported a history of seizures due to head trauma which occurred

18   in 1989. His last seizure occurred on January 25, 2016. Plaintiff reported a history

19   of asthma, bipolar disorder, paranoid schizophrenia, and major depression. He had

20   been hospitalized at psychiatric hospitals on several occasions in the past. He had

21   received medications from CVS Pharmacy and Walmart Pharmacy. Plaintiff used

22   an albuterol inhaler as needed, and Advair as needed. His additional current

23   medications were Keppra, gabapentin, Cogentin, and Wellbutrin. Plaintiff reported

24   consuming 40 to 60 ounces of beer per day, for the prior four months. He had last

25   consumed alcohol on January 22, 2016. (*Id*).

26   _____

27   [1]
     The Facts section describes the care and treatment Plaintiff received at CCDC between February
28   3, 2016, the date he was booked at CCDC, to December 3, 2016, the date the TAC was filed.  The
     TAC alleges the same facts as the FAC

**NAPHCARE DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY
JUDGMENT**                                                           -2-

1          On February 3, 2016, Ray Montenegro, a nurse practitioner, reviewed the

2     notes regarding Ms. Pagaduan's examination of Plaintiff. Mr. Montenegro's

3     assessments were seizures, asthma, back pain, neck pain, bipolar disorder,

4     schizophrenia, and depression. He ordered Levetiracetam (Keppra), gabapentin,

5     and a lower bunk for the seizure disorder. He ordered albuterol for asthma. He

6     ordered ibuprofen for back and neck pain. Finally, he ordered a psychiatric

7     evaluation. (Exhibit A, pp. 25-26). The treatment records reflect Plaintiff continued

8     to be assigned to a lower bunk/lower tier from February 3, 2016 through May 16,

9     2017. (Exhibit A, p. 1).

10         On February 9, 2016, Dr. Larry Williamson, a family medicine physician and

11    the medical director at CCDC, saw Plaintiff. Plaintiff reported a history of a moped

12    accident. He had been hit from behind and dragged 40 feet by a car. Plaintiff

13    reported he had been seen at a hospital after the incident, and was released after

14    some CT scans were performed. Since the accident, Plaintiff had been seen by Dr.

15    Firooz Mashhood, a physical medicine and rehabilitation specialist, and had

16    started physical therapy. Plaintiff reported Dr. Mashhood wanted to performed

17    some type of treatment to the spine which he thought involved injections of

18    silicone. He was incarcerated before the treatment could begin. Plaintiff requested

19    to be placed on the pain medication recommended by Dr. Mashhood, and to

20    continue physical therapy. (Exhibit A, p. 25).

21         Dr. Williamson performed a physical examination. He noted Plaintiff's gait

22    was normal and he was able to get in and out of a chair without assistance. Dr.

23    Williamson advised Plaintiff that he did not prescribe opiates for the management

24    of chronic pain in the jail. Plaintiff indicated he did not want to change his current

25    medications, unless Dr. Williamson would prescribe opiates. Dr. Williamson

26    advised Plaintiff to use the physical therapy techniques he had learned as part of

27    his home exercise program. The plan was for Plaintiff to follow-up as needed, and

28    to be seen in the chronic care clinic for asthma and the seizure disorder. (*Id*).

**NAPHCARE DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT**                                                                                -3-

1    On February 3, 2016, Plaintiff completed an authorization for release of
2    information to obtain his medical records from Dr. Mashhood. The authorization
3    for release was sent to Dr. Mashhood by fax, on February 9, 2016.  (Plaintiff's
4    Medical Records from NaphCare Inc., Exhibit B, pp. 370-373).

5    On February 4, 2016, Sarah Hansen, a mental health nurse, performed a
6    mental health evaluation. Plaintiff was scheduled for a sick call with a psychiatrist.

7    On February 10, 2016, Theresa Houghton, a registered nurse saw Plaintiff for
8    a psychiatric evaluation. Ms. Houghton noted a release of information was being
9    sent to CVS Pharmacy and Walmart Pharmacy to verify Plaintiff's prior
10   medications. (Exhibit A, pp. 121-125).

11   On February 11, 2016, Dr. John Valles, a psychiatrist, saw Plaintiff. Dr. Valles
12   and Plaintiff discussed Plaintiff's prior psychiatric diagnoses and treatment. Dr.
13   Valles' assessments included schizophrenia. He prescribed Haldol, Cogentin, and
14   Wellbutrin. The plan was to monitor Plaintiff for medication efficiency and
15   tolerability. (Exhibit A, pp. 116-121).

16   On February 15, 2016, Pam Walter, a registered nurse, saw Plaintiff for a
17   psychiatric evaluation. Plaintiff requested to be seen by a psychiatric provider for
18   a medication review, because he had a stiff neck. Ms. Walter advised Plaintiff his
19   psychiatric medications had only been started four days prior, and he was not due
20   for a medication review until 30 days after starting the medication. Plaintiff
21   reported he would inform officers if his symptoms worsened. (Exhibit A, p. 24).

22   On February 15, 2016, Dr. Williamson saw Plaintiff. Plaintiff asked "to start
23   back on narcotic pain medication." Dr. Williamson explained it was not his
24   practice to prescribe narcotic pain medication for chronic pain. However, he
25   indicated he would make some changes in the current medications, by adding
26   Tylenol.  (Exhibit A, p. 24).

27   On February 17, 2016, Dr. Valles saw Plaintiff. Plaintiff reported feeling much
28   better since his psychiatric medications had been restarted. He was hearing voices

**NAPHCARE DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT**                                                                          -4-

1   less frequently. He denied feeling depressed or anxious. He denied any suicidal

2   ideation or thoughts of harming others. Dr. Valles noted Plaintiff's neurovegetative

3   functioning had significantly improved. The plan was to continue the current

4   medications. (Exhibit A, pp. 112-116).

5   On February 21, 2016, Plaintiff refused to have his blood drawn for an HIV

6   test and a rapid plasma reagin test. Plaintiff stated "I don't like needles." (Exhibit

7   A, p. 208.)

8   On March 11, 2016, Plaintiff signed an authorization for release of his

9   medical records from UC Davis Medical Center/Infectious Disease. The release of

10  information was faxed to UC Davis Medical Center on March 14, 2016.  (Exhibit B,

11  p. 378).

12  On March 17, 2016, Dr. Matthew Johnson, a psychiatrist, attempted to see

13  Plaintiff. He noted Plaintiff was in court at the time. (Exhibit A, p. 109).

14  On March 21, 2016, Dr. Williamson saw Plaintiff for a chronic care visit.

15  Plaintiff reported he had been previously diagnosed with coccidioides (Valley

16  fever) and treated by an infectious disease specialist whom he thought was Dr.

17  Richard Allen, at UC Davis Medical Center in Sacramento, California. Plaintiff had

18  been treated with Diflucan and had been given a wrist brace to keep his hand out

19  of a flexion position. In addition, Plaintiff reported a history of a seizure disorder,

20  and asthma. Dr. Williamson performed a physical examination and contacted the

21  infectious disease department at UC Davis Medical Center. UC Davis Medical

22  Center advised Dr. Williamson they had no history of a patient by Plaintiff's name.

23  There was a physician at UC Davis Medical Center name Dr. Richard Allen, who

24  was an orthopedic surgeon. The plan was to obtain records to verify Plaintiff's

25  history of being prescribed Diflucan and an orthopedic brace.  (Exhibit A, pp. 103-

26  108). On March 26, 2016, Plaintiff was prescribed ibuprofen. (Exhibit A, p. 8).

27  On April 1, 2016, NaphCare sent an authorization to release medical records

28  signed by Plaintiff to UC Davis Medical Center Medical Center by fax. The fax cover

1    sheet indicated it was the second request for the records. The fax cover sheet
2    indicated Plaintiff was also known as "Jason Saunders." (Exhibit B, pp. 379-387).

3         On April 7, 2016, Dr. Williamson saw Plaintiff. Plaintiff complained of
4    continued pain in the left arm. The pain had began during the moped accident in
5    2015. He reported having surgery on his arm at UC Davis Medical Center. Plaintiff
6    reported ibuprofen was not improving his pain. He asked to be returned to Dr.
7    Mashhood to continue taking opioids. Dr. Williamson performed a physical
8    examination. He noted the left arm was unchanged, with a prominent third
9    extensor tendon. His assessment was chronic pain. He noted Plaintiff was
10   reluctant to try any different medications. Eventually, Plaintiff agreed to take
11   carbamazepine (Tegretol). Dr. Williamson requested ibuprofen. He prescribed
12   naproxen, acetaminophen, and carbamazepine. (Exhibit A, pp. 23-24).

13        On April 12, 2016, Plaintiff refused to take Naproxen, carbamazepine,
14   Cogentin, Haldol, and Keppra. (Exhibit A, p. 202).

15        On April 13, 2016, Dr. Valles saw Plaintiff. Plaintiff reported feeling
16   depressed. He requested an increase of the dose of Wellbutrin and discontinuation
17   of Tegretol. Dr. Valles increased the dose of Wellbutrin. He noted Tegretol was
18   prescribed for medical reasons. He communicated Plaintiff's interest to have the
19   medication discontinued to an unspecified physician. (Exhibit A, pp. 99-103).

20        On April 13, 2016, Plaintiff refused to take Keppra and naproxen. (Exhibit A,
21   p. 200).

22        On April 14, 2016, the Health Information Management Department of UC
23   Davis Medical Center indicated it was unable to fulfill NaphCare's request for
24   Plaintiff's medical records. UC Davis Medical Center indicated there was no patient
25   found with Plaintiff's name and date of birth. (Exhibit B, pp. 388-389).

26        On April 22, 2016, Arthur Galicia, a licensed practical nurse, saw Plaintiff. He
27   noted Plaintiff had submitted a grievance and a medical request about suffering
28   from an asthma attack and not being provided with his albuterol inhaler. Mr.

1    Galicia asked Plaintiff if he needed a breathing treatment. Plaintiff advised Mr.
2    Galicia he did not need a breathing treatment.  (Exhibit A, p. 23).

3         On April 22, 2016, Dr. Williamson saw Plaintiff. Dr. Williamson noted Plaintiff
4    had advised a nurse the albuterol did not help with this asthma. Plaintiff asked for
5    an inhaler. Dr. Williamson prescribed an Atrovent inhaler the same day. (Exhibit
6    A, p. 23).

7         On May 3, 2016, Plaintiff was prescribed gabapentin and levetiracetam
8    (Keppra). (Exhibit A, 7).

9         On May 19, 2016, Plaintiff refused to take Tegretol. (Exhibit A, p. 199).

10        On May 23, 2016, Dr. Williamson saw Plaintiff. Plaintiff requested to see "all
11   of his specialists." Plaintiff asked to be treated with "the same narcotic medication
12   his specialists had him on prior to the jail." Dr. Williamson noted Plaintiff had
13   stated he was claiming deliberate indifference by Dr. Williamson and the entire
14   staff. Dr. Williamson performed a physical examination. He noted Plaintiff's gait
15   was normal and he did not exhibit pain behavior. He did have a prominent third
16   extensor tendon on the left hand. Dr. Williamson reviewed a prescription
17   monitoring report from the Nevada State Board of Pharmacy. He noted Plaintiff
18   filled a prescription for hydrocodone on October 27, 2015, and refilled the
19   prescription on November 16, 2015. Each prescription was for 60 pills, a 30 day
20   supply. Dr. Williamson noted the medication was refilled early. (Exhibit A, pp. 22-
21   23).

22        Dr. Williamson advised Plaintiff that neither UC Davis Medical Center nor Dr.
23   Mashhood had sent any notes, radiologic studies, or operative reports. Further, UC
24   Davis Medical Center reported they did not have any record of Plaintiff either under
25   his name or his alias. At that point, Plaintiff advised Dr. Williamson "never mind,
26   I'm fine." Plaintiff left the sick call appointment.  Dr. Williamson noted Plaintiff had
27   not made any pain complaints specific to parts of the body, he simply requested
28   narcotics for pain. Dr. Williamson planned to review Plaintiff's records again to see

1  if there was any indication for any additional studies. (*Id*).

2  On May 24, 2016, Plaintiff refused to have x-rays of the cervical spine and
3  lumbar spine performed. He noted he needed an MRI of the back due to nerve
4  damage, not an x-ray.  (Exhibit A, p. 197).

5  On June 1, 2016, Mr. Galicia noted Plaintiff had written a kite stating he
6  suffered from another seizure, and had suffered numerous injuries including
7  splitting his head, biting his lip, and "busting" his right eye. Mr. Galicia noted
8  Plaintiff's skin was intact. There were no open wounds on the head or the lip.
9  There was no sign of a busted right eye. Plaintiff reported "I just want to see the
10  doctor." (Exhibit A, p. 21).

11  On June 4, 2016, Horace Tadeo, a registered nurse, saw Plaintiff. Plaintiff
12  reported he had a seizure on June 1, 2016, but he was "fine now." Plaintiff reported
13  "all my injuries are healed now."  Mr. Tadeo noted there were no signs of head
14  trauma, new or old, or any other injuries noted. (Exhibit A, p. 21).

15  On June 3, 2016, Leesha Bitto, a psychiatric nurse practitioner, saw Plaintiff.
16  Plaintiff reported feeling well. He believed the increase in the Wellbutrin dose had
17  improved his mood.  (Exhibit A, pp. 93-97).

18  On June 16, 2016, Desiree Zaccarelli, a registered nurse, saw Plaintiff. She
19  noted Plaintiff was requesting dosage sheets for Percocet and Lortab. Ms.
20  Zaccarelli advised Plaintiff that dosage sheets for those medications were not
21  available because those medications were not prescribed. Ms. Zaccarelli and
22  Plaintiff discussed the fact that UC Davis Medical Center was unable to locate his
23  medical records. Plaintiff requested that a release of information be faxed once
24  again which included his alias. The plan was to fax the release of information
25  request UC Davis Medical Center again. (Exhibit A, p. 21).

26  On June 30, 2016, Dr. Williamson saw Plaintiff. Plaintiff reported suffering
27  long-term pain from Valley fever. He reported he had been treated by an infectious
28  disease specialist in California, who had performed surgery on the left extensor

tendon. Plaintiff reported the surgery and treatment for Valley fever began in 2005. Plaintiff insisted on returning to Dr. Mashhood and Dr. Evarista Nnadi, a family medicine specialist, for narcotic pain medication. In addition, he requested physical therapy. Dr. Williamson performed a physical examination. He noted Plaintiff's gait was normal. The left third extensor was prominent, with no change from previous examinations. (Exhibit A, p. 21).

Dr. Williamson noted that he did not see any indication to refer Plaintiff to physical therapy. Further, he noted pain management at the jail did not include the use of narcotics. He advised Plaintiff that the healthcare providers he identified either did not have, or did not produce, any records. He advised Plaintiff to contact the healthcare providers directly, or to have his family members contact them. (Exhibit A, pp. 20-21).

On July 1, 2016, Plaintiff signed authorizations for release of information from St. Rose Dominican Hospital, Family First Medical/Dr. Nnadi, Corcoran District Hospital, Palmdale Regional Hospital, the Federal Receiver's Office, UC Davis Medical Center/Infectious Disease, Dr. Mashhood, and Henderson Detention Center. (Exhibit B, pp. 391-409). On July 1, 2016, NaphCare sent signed releases of information to the following healthcare providers by fax: St. Rose Dominican Hospital; Dr. Mashhood; and Henderson Detention Center. (*Id*).

On July 2, 2016, NaphCare sent signed releases of information to the following healthcare providers by fax: Palmdale Regional Hospital; the Federal Receiver's Office; and UC Davis Medical Center/Infectious Disease. NaphCare attempted to send a signed release of information to Corcoran District Hospital by fax on July 2, 2016. (Exhibit B, pp. 394-399). According to the fax transmission record, the number was busy. (Exhibit B, p. 393).

On July 8, 2016, NaphCare sent the release of information signed by Plaintiff to Family First Medical by fax. (Exhibit B, pp. 409, 413).

On July 20, 2016, Dr. Williamson saw Plaintiff. Plaintiff continued to request

**NAPHCARE DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT** -9-

1 to be referred to outside specialists for pain management. In addition, he

2 requested treatment for Valley fever. Dr. Williamson reviewed records from

3 Sunrise Hospital and Medical Center and Dr. Mashhood. He noted Plaintiff had

4 been seen in an emergency department after the motor vehicle accident in

5 September 2015. CT scans were performed of the head, neck, and abdomen. The

6 CT scans were negative for any injury. An x-ray did show a nondisplaced fracture

7 of a bone in the right hand.  Dr. Williamson noted Plaintiff had seen Dr. Mashhood

8 on October 27, 2015, after he was seen by Dr. Nnadi for an initial visit. Each

9 physician prescribed hydrocodone. Dr. Mashhood prescribed a 30 day course.

10 When Plaintiff returned to Dr. Mashood 19 days later on November 16, 2015, he

11 received another 30 day prescription for hydrocodone.  (Exhibit A, pp. 20-21).

12 Dr. Williamson noted he had seen Plaintiff on six previous occasions since

13 his arrest on February 3, 2016. On each occasion, he had requested narcotic pain

14 medication, he had been nonspecific about the location of his pain, and he had not

15 demonstrated any pain behavior. Plaintiff again reiterated his request for narcotic

16 pain medication. However, he did not describe the site or severity of his pain.

17 Further, he had no deficits in gait, movement, or affect. Dr. Williamson planned to

18 review Plaintiff's prior medical records to see if an x-ray of the chest was available.

19 If no recent study was available, he would order an x-ray of the chest to evaluate

20 Valley fever. Dr. Williamson noted he would not change Plaintiff's medications at

21 that point, because he considered Plaintiff an unreliable historian. (Exhibit A, pp.

22 20-21).

23 On July 20, 2016, Dr. Dean Yarbo reviewed an x-ray of the chest. His

24 impression was a normal chest.  (Exhibit A, p. 191).

25 On July 21, 2016, Dr. Harry Duran, an occupational medicine and addiction

26 specialist, saw Plaintiff. Plaintiff complained of "pain all over, in the neck, the back,

27 the left shoulder and wrist." Plaintiff reported having undergone treatment for

28 Valley fever at several facilities in California in 2005. Plaintiff requested to be

continued on treatment for Valley fever. He reported previously being treated with Diflucan. In addition, Plaintiff reported undergoing surgery to the left wrist for Valley fever. Dr. Duran performed a physical examination. He noted Plaintiff was in no distress. Plaintiff reported mild tenderness in the right mid lumbar paraspinous muscles. He had full range of motion in the neck, waist, and shoulders, without any pain on range of motion. Dr. Duran noted there was scarring of the left wrist with absent wrist flexion. Dr. Duran's assessments were a history of coccidioidomycosis, "left wrist arthrodesis status" and lumbago. He advised Plaintiff a release of information was necessary to confirm the diagnosis of coccidioidomycosis and to confirm the status of the left wrist. Further, Dr. Duran noted "It does not appear on examination that there is a severe impairing pain syndrome." He noted non-steroid anti-inflammatory medications taken as needed should be sufficient for pain management. Finally, Dr. Duran ordered an x-ray of the left wrist.   (Exhibit A, pp. 19-20).

On July 22, 2016, NaphCare sent a request for Plaintiff's medical records to UC Davis Medical Center. The request included an authorization for release of information signed by Plaintiff.  (Exhibit B, pp. 415-416).

On July 22, 2016, Dr. Yarbo reviewed an x-ray of the left wrist. His impression was "no significant abnormality of the wrist."  (Exhibit A, p. 187).

On August 4, 2016, Plaintiff filed a medical grievance. Plaintiff claimed he had a seizure on July 29, 2016 and fell from his bunk, resulting in a fracture of the right hand. Plaintiff alleged that Mr. Galicia had verbally inspected the hand and concluded it was not broken. Plaintiff requested to be seen by an orthopedic surgeon and to have an x-ray taken. On August 4, 2016, Dr. Williamson responded to Plaintiff's grievance. He noted an x-ray of the right hand and elbow had been ordered. Dr. Williamson also reordered naproxen, which had been discontinued in April 2016 after Plaintiff refused to take the medication. (Plaintiff's Records from NaphCare Inc., Exhibit C, p. 447).

**NAPHCARE DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT** -11-

1    On August 4, 2016, Mr. Tadeo saw Plaintiff. Plaintiff reported he had broken

2 his hand during a fall from his bed caused by a seizure. He was requesting an x-ray.

3 Mr. Tadeo noted there was a noticeable deformity to the third and fifth

4 metacarpals on the right hand. There was no swelling, no bruising, and no redness.

5 Plaintiff reported the hand was not tender to palpation. (Exhibit A, p. 19).

6    On August 4, 2016, Dr. Yarbo reviewed an x-ray of the right hand. He noted

7 there was no evidence of an acute fracture or dislocation. His impression was

8 "congenital shortening of the fourth and fifth metacarpals."  (Exhibit A, p. 185).

9    On August 4, 2016, Dr. Yarbo reviewed an x-ray of the right elbow. He noted

10 there was no evidence of a fracture or joint effusion. His impression was an

11 olecranon spur. (Exhibit A, p. 186).

12    On August 9, 2016, Dr. Williamson saw Plaintiff. Dr. Williamson advised

13 Plaintiff of the results of the x-rays of the right hand, right wrist, right elbow, and

14 chest. Dr. Williamson noted he read the results of the studies to Plaintiff verbatim.

15 He explained there were no fractures seen on any of the x-rays, only an olecranon

16 spur on the right elbow. Dr. Williamson explained the chronic and benign nature

17 of a spur. Further, he noted there were no findings consistent with Valley fever on

18 the chest x-ray. (Exhibit A, p. 19).

19    On August 11, 2016, Holly Crosby, a psychiatric nurse practitioner, saw

20 Plaintiff. Dr. Williamson had requested an evaluation of Plaintiff because Plaintiff

21 was exhibiting symptoms of paranoia during a sick call. Plaintiff refused to speak

22 to Ms. Crosby. (Exhibit A, pp. 89-93).

23    On August 25, 2016, Dr. Williamson saw Plaintiff for follow-up regarding

24 wrist pain. Dr. Williamson noted Plaintiff had been prescribed a variety of

25 medications to address the issue including Haloperidol, Benztropine Mesylate,

26 naproxen, and gabapentin. Plaintiff claimed the x-rays which have been performed

27 were altered and fraudulent. Dr. Williamson reviewed the x-rays again. He noted

28 there was no evidence of any fracture. The only abnormal finding was an

1   olecranon spur. Plaintiff asked to see an "unbiased doctor," and asked for a lower

2   bunk restriction. Dr. Williamson noted a lower bunk had been ordered

3   continuously since intake on February 3, 2016. Plaintiff was requesting medications

4   for Valley fever "before I die." (Exhibit A, pp. 18-19).

5       On August 25, 2016, Dr. Yarbo reviewed an x-ray of the right hand. His

6   impressions were "Healing fracture of the midshaft of the third metacarpal with

7   satisfactory alignment and apposition of the fracture fragments." (Exhibit A, p. 179).

8       On August 26, 2016, NaphCare received Plaintiff's records from UC Davis

9   Medical Center. In the records, Plaintiff was identified by an alias "Jason

10  Saunders." (Exhibit A, p. 181-183). Fluconazole (Diflucan), was prescribed on

11  August 26, 2016. (Exhibit A, p. 7).

12      On August 26, 2016, Dr. Williamson saw Plaintiff. Dr. Williamson advised

13  Plaintiff of the results of the x-ray of the right hand from August 25, 2016. He noted

14  a nondisplaced fracture was identified on the films which had a callous formed at

15  the fracture site of the third metacarpal. Dr. Williamson advised Plaintiff that the

16  injury had occurred eight weeks ago and the nondisplaced fracture had a proper

17  callous formation. Accordingly, further intervention would not be necessary. He

18  advised Plaintiff to "show some care not to refracture the area with vigorous

19  activity." (Exhibit A, p. 18).

20      On September 2, 2016, Dr. Williamson saw Plaintiff for a chronic care visit.

21  Dr. Williamson noted Plaintiff had no complaints of seizures or asthma. He

22  performed a physical examination. He noted there was prominence of the left

23  extensor tendon, and a small bony prominence on the right hand over the third

24  metatarsal. His assessments were good disease control of the seizure disorder and

25  asthma. The plan was to continue the current anticonvulsants, to perform annual

26  laboratory tests, and to use a rescue inhaler as needed. (Exhibit A, pp. 84-89).

27      On September 16, 2016, Tiffany Russaw, a psychiatric nurse practitioner,

28  saw Plaintiff. Plaintiff reported feeling fine. He noted his medications had helped

1   him stabilize. (Exhibit A, pp. 80-84).

2       On September 20, 2016, Plaintiff refused the following medications:

3   fluconazole, Haldol, Cogentin, gabapentin, and Keppra. (Exhibit A, p. 170).

4       On September 23, 2016, Plaintiff submitted a medical request. Plaintiff

5   requested to see a Valley fever specialist, to have certain laboratory tests, to see

6   a pain management specialist, and "to see all of the other specialists previously

7   requested." (Exhibit B, p. 420).

8       On September 27, 2016, Dr. Williamson responded to Plaintiff's request. Dr.

9   Williamson advised Plaintiff laboratory tests had been ordered. He noted that if

10   Plaintiff refused laboratory tests again, he would not be able to assess Plaintiff's

11   need to be referred to an infectious disease specialist. Dr. Williamson advised

12   Plaintiff they would discuss a referral to a pain management specialist after the

13   laboratory test results were available. He advised Plaintiff to continue Tylenol in the

14   meantime. Further, he advised Plaintiff there was no need for a referral to an

15   orthopedic surgeon. (Exhibit B, p. 420).

16       On October 18, 2016, Dr. Williamson saw Plaintiff to review laboratory test

17   results, and to discuss his request for referrals to specialists including pain

18   management, orthopedics, and infectious disease. Dr. Williamson noted the

19   laboratory test results indicated Plaintiff was on the appropriate medication for

20   Valley fever, and the chest x-ray did not show any active disease. Plaintiff and not

21   been seen by an infectious disease specialist in the previous eight years before his

22   incarceration. Accordingly, Dr. Williamson did not believe a referral to infectious

23   disease was indicated. Dr. Williamson noted Plaintiff had been seen for his

24   orthopedic injuries over a year ago, and he had not sought an orthopedic referral

25   in the five months preceding his arrest. There were no new fractures identified.

26   The injury to the third metacarpal was documented at St. Rose Dominican

27   Hospital, and was well healed according to the recent x-rays performed at the jail.

28   (Exhibit A, p. 18).

**NAPHCARE DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY**
**JUDGMENT**       -14-

1    Dr. Williamson noted that Plaintiff had been seen by a pain specialist in the
2    jail, Dr. Duran, who recommended nonsteroid anti-inflammatory medications.
3    Further, the treatment Plaintiff had received was in excess of the treatment Dr.
4    Duran recommended. Dr. Williamson reviewed the notes of Dr. Mashhood. Dr.
5    Mashhood noted Plaintiff's pain behavior was not consistent and he had violated
6    his pain contract. However, Plaintiff was prescribed narcotics in the third and final
7    visit with Dr. Mashhood, two months prior to his incarceration. Dr. Williamson did
8    not change Plaintiff's current therapy.   (Exhibit A, p. 18).

9    On October 27, 2016, Plaintiff submitted a medical request. Plaintiff noted
10   he was "involved in a physical incident in excess of verbal persuasion where my
11   neck was grabbed and substantial pressure was used pushing my faced into a
12   wall." He reported pain and decreased range of motion in the neck. He requested
13   to see a "neck/spine doctor" and to have an imaging study taken. (Exhibit C, p.
14   417). On October 31, 2016, a registered nurse, responded to Plaintiff's request. She
15   scheduled Plaintiff for a sick call appointment. She advised him to increase fluid
16   and activity, and to use ibuprofen or Tylenol. (*Id*).

17   On November 2, 2016, Eric Lopez, a physician assistant, saw Plaintiff.
18   Plaintiff complained of chronic pain in the neck which affected his range of
19   motion. Plaintiff reported the injury occurred during a motor vehicle accident in
20   approximately September 2015. Plaintiff denied any paresthesias, radicular
21   symptoms, or decreased grip strength. Mr. Lopez performed a physical
22   examination. He noted there were was full range of motion in the neck. Mr. Lopez'
23   assessment was "self-reported history of neck injury from 2015, unremarkable
24   exam." He prescribed a short course of Naprosyn with Zantac. He recommended
25   an x-ray of the cervical spine. Plaintiff requested an x-ray of the left shoulder. Mr.
26   Lopez noted he would order the study despite the fact Plaintiff had no active
27   complaints related to the shoulder.  (Exhibit A, p. 17).

28   On November 3, 2016, Dr. Dean Yarbro reviewed an x-ray of the left shoulder

NAPHCARE DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY
JUDGMENT                                                                    -15-

1  and an x-ray of the cervical spine. His impression regarding the x-ray of the

2  shoulder was "no significant abnormality of the shoulder." His  impressions

3  regarding the x-ray of the cervical spine were "disc disease and spondylosis at C5

4  –6." (Exhibit A, 173).

5         On November 4, 2016, Eileen Murillo, a registered nurse, saw Plaintiff during

6  segregated housing rounds. She noted Plaintiff was cooperative. He was assessed

7  for medical needs, and did not need any additional healthcare.  (Exhibit A, pp. 73-

8  74).

9         On November 17, 2016, Dr. Williamson saw Plaintiff. Plaintiff complained his

10  pain was not as well-controlled as he would like. He did not believe the naproxen

11  was effective. Dr. Williamson performed a physical examination. He noted

12  Plaintiff's gait was normal and there was normal tone in the arms. Dr. Williamson

13  read the reports for the recent x-rays to Plaintiff and explained the interpretations.

14  Plaintiff indicated he had no questions. Dr. Williamson reviewed the medications

15  Plaintiff was taking with him. Dr. Williamson's assessment was pain syndrome. He

16  discontinued naproxen. The plan was for Dr. Williamson to review Plaintiff's

17  medical history to determine if treatment with another nonsteroid anti-

18  inflammatory had been successful in the past.  (Exhibit A, pp. 16-17).

19                **III.    LEGAL STANDARD**

20       **A.    Motion to Dismiss**

21         A Federal Rule of Civil Procedure 12(b)(6) motion tests the legal sufficiency

22  of the claims stated in the complaint.  The Court must decide whether the facts

23  alleged, if true, would entitle plaintiff to some form of legal remedy. *De La Cruz v.*

24  *Tormey*, 582 F.2d 45, 48 (9th Cir. 1978).  While the standard under Rule 12(b)(6)

25  does not require detailed factual allegations, a plaintiff must provide more than

26  mere labels and conclusions. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555

27  (2007). A formulaic recitation of the elements of a cause of action is insufficient.

28  *Id*.

**NAPHCARE DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY**
**JUDGMENT**                                                                 **-16-**

1

### B.     Motion for Summary Judgment

2      Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary

3  judgment is proper "where the record before the Court on the motion reveals the

4  absence of any material facts and [where] the moving party is entitled to prevail

5  as a matter of law." *Zoslaw v. MCA Distributing Corp.*, 693 F.2d 870, 883 (9th Cir.

6  1982), cert. denied, 460 U.S. 1085 (1983)(quoting *Portland Retail Druggists*

7  *Association v. Kaiser Foundation Health Plan*, 662 F.2d 641, 645 (9th Cir. 1981), cert.

8  denied, 460 U.S. 1085 (1983). "A material issue of fact is one that affects the

9  outcome of the litigation and requires a trial to resolve the parties differing versions

10  of the truth." *Securities and Exchange Commission v. Seaboard Corporation*, 677

11  F.2d 1289, 1293 (9th Cir. 1982); *United States v. First National Bank of Circle*, 652

12  F.2d 882, 887 (9th Cir. 1981).

13      As the courts have emphasized over and over again, only genuine issues of

14  material fact will defeat summary judgment. In *Scott v. Harris*, 550 U.S. 372, 380,

15  127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007), the Supreme Court spoke directly to the

16  respective summary judgment burdens in a civil rights excessive force case where

17  the Defendant denies any wrongdoing,

18  
19  
20  
21  
22  
23

> [T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." [citation omitted] When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

### IV.     LEGAL ARGUMENT REGARDING MOTION TO DISMISS

24  
25

### A.     Plaintiff's Claims Against the LPN Defendants are Barred by the Statute of Limitations.

26      On June 12, 2019, Plaintiff filed a motion to requesting leave to file the FAC.

27  (ECF No. 246) The FAC substituted numerous NaphCare nurses for Doe

28  defendants. With the exception of Horance Tadeo, a registered nurse, each of the

**NAPHCARE DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT**                                                                          -17-

1   newly named Defendants are licensed practical nurses, whose role in Plaintiff's

2   care was almost exclusively limited to medication administration.  The § 1983

3   claims against the LPN Defendants are barred by the statute of limitations.

4         The timeliness of § 1983 claims is governed by the forum state's

5   personal-injury statute of limitations. The Nevada statute of limitations for personal

6   injury claims is two years. NRS 11.190(4)(e). Because the events from which the

7   present case arises took place in 2016, and the FAC was filed on June 12, 2019, the

8   § 1983 claims against the LPN Defendants are untimely and should be dismissed

9   with prejudice.

10        As to new parties added in the FAC, Rule 15(c)(1)(C) provides that an

11  amendment that "changes the party or the naming of the party against whom a

12  claim is asserted" relates back if the amendment arises from the same "conduct,

13  transaction, or occurrence set out" in the original pleading and the newly named

14  party "(i) received such notice of the action that it will not be prejudiced in

15  defending on the merits; and (ii) knew or should have known that the action

16  would have been brought against it, but for a mistake concerning the proper party's

17  identity."

18        In this case, the amendments arise from the same transaction or occurrence

19  as the original pleading. However, the LPN Defendants should not have known this

20  action would be brought against them. Their role in Plaintiff's care at CCDC was

21  minor, as illustrated below.

22        **i.   Elizabeth Akhtar**

23        Ms. Akhtar is a licensed practical nurse. Her involvement in Plaintiff's care

24  was limited to administering medications prescribed to Plaintiff. (Exhibit A pp. 19,

25  and 269-270.)

26        **ii.   Elizabeth Acevedo**

27        Ms. Acevedo is a licensed practical nurse. Her involvement in Plaintiff's care

28  was limited to administering medications prescribed to Plaintiff. (Exhibit A pp. 275,

**NAPHCARE DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT**                                                               -18-

1   and 337.)

2           **iii.**    **Deborah Canto**

3         Ms. Canto is a licensed practical nurse. Her involvement in Plaintiff's care

4   was limited to administering medications prescribed to Plaintiff, on one date, July

5   27, 2016. (Exhibit A p. 280.)

6           **iv.**    **Debra Vanderwaag**

7         Ms. Vanderwaag is a licensed practical nurse. Her involvement in Plaintiff's

8   care was limited to a weight check performed on March 3, 2017, administering

9   medications prescribed to Plaintiff. (Exhibit A pp. 2, 16, 226, 228, 286, 287, 341, 342,

10  and 343.)

11          **v.**    **Remielyn Manding**

12        Ms. Manding is a licensed practical nurse. Her involvement in Plaintiff's care

13  was limited to administering medications prescribed to Plaintiff, and authoring a

14  note indicating Plaintiff was not wearing the wrist brace which he claims he

15  required. (Exhibit A pp. 2, 312, 333, 334, 335. 336, and 339.)

16          **vi.**    **Frederick Laita**

17        Mr. Laita is a licensed practical nurse. His involvement in Plaintiff's care was

18  limited to administering medications prescribed to Plaintiff. (Exhibit A pp. 210, and

19  322.)

20          **vii.**    **Rochele Peoples**

21        Ms. Peoples is a licensed practical nurse. Her involvement in Plaintiff's care

22  was limited to administering medications prescribed to Plaintiff. (Exhibit A pp. 218,

23  234, and 256.)

24          **viii.**    **Lawanda McClain**

25        Ms. McClain is a licensed practical nurse. Her involvement in Plaintiff's care

26  was limited to administering medications prescribed to Plaintiff. (Exhibit A pp. 215,

27  and 270.)

28  ///

**NAPHCARE DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT**    -19-

1        **ix.     Michelle Gonzales**

2                Ms. Gonzales is a licensed practical nurse. Her involvement in Plaintiff's care

3        was limited to administering medications prescribed to Plaintiff. (Exhibit A pp. 275,

4        277, 279, 281, and 282.)

5        **x.      Marian Murriel**

6                Ms. Murriel is a licensed practical nurse. Her involvement in Plaintiff's care

7        was limited to administering medications prescribed to Plaintiff. (Exhibit A pp. 282

8        and 283.)

9        **xi.     Marina Alberto**

10               Ms. Alberto is a licensed practical nurse. Her involvement in Plaintiff's care

11       was limited to administering medications prescribed to Plaintiff. (Exhibit A pp. 303,

12       304, 343, 344, 347, 348, 349, 350, and 351.)

13       **xii.    Mestawote Williams**

14               Ms. Williams is a licensed practical nurse. Her involvement in Plaintiff's care

15       was limited to administering medications prescribed to Plaintiff. (Exhibit A pp. 229,

16       230, 320, 361, and 362.(

17       **xiii.   Amanda Vertner**

18               Ms. Vertner is a licensed practical nurse. Her involvement in Plaintiff's care

19       was limited to administering medications prescribed to Plaintiff. (Exhibit A pp. 227,

20       228, 277, 341, 343, 344, 345, 347, 348, 350, 351, 353, 354, 355, 356, 357, 358, 360 and

21       361. )

22       **xiv.    Crystal Gonzalez**

23               Ms. Gonzalez is a licensed practical nurse. Her involvement in Plaintiff's care

24       was limited to administering medications prescribed to Plaintiff, on one day, May

25       22, 2016. (Exhibit A p. 311. )

26               There is no reasonable argument that any of the LPN Defendants should

27       have known they would be named as a defendant in this action.  None of the LPN

28       Defendants had any role in Plaintiff's alleged constitutional rights violations. Their

NAPHCARE  DEFENDANTS'  MOTION  TO  DISMISS  AND  MOTION  FOR  SUMMARY
JUDGMENT                                                                              -20-

1   role in Plaintiff's care was almost exclusively limited to the administration of

2   medications. Accordingly, the amendment adding these new parties do not relate

3   back under Rule 15, and the claims are barred by the statute of limitations.

4   **V.     LEGAL ARGUMENT REGARDING MOTION FOR SUMMARY JUDGMENT**

5   **A.     Plaintiff Fails to Present Evidence to Support His First Amendment**
        **Retaliation Claim.**

6

7       In the Screening Order, the portion of Count I alleging retaliation was

8   permitted to proceed against Mr. Galicia.  To state a viable First Amendment

9   retaliation claim in the prison context, a Plaintiff must allege: "(1) [a]n assertion

10  that a state actor took some adverse action against an inmate (2) because of (3)

11  that prisoner's protected conduct, and that such action (4) chilled the inmate's

12  exercise of his First Amendment rights, and (5) the action did not reasonably

13  advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-568

14  (9th Cir. 2004). The Court found the Third Amended Complaint stated a colorable

15  retaliation claim against Mr. Galicia, by alleging he refused to process Plaintiff's

16  release of information forms on July 1, 2016, because Plaintiff had filed a lawsuit.

17      Plaintiffs' claim against Mr. Galicia fails for two reasons. First, there is no

18  competent evidence Mr. Galicia refused to process Plaintiff's release of information

19  forms. Second, the injury Plaintiff contends he suffered from the **alleged five day**

20  **delay** in processing the release of information forms is de minimus, and therefore

21  precludes recovery.

22          **i.     Mr. Galicia Did Not Refuse to Process Plaintiff's Release of**
                **Information Forms.**

23

24      NaphCare requested Plaintiff's records from multiple healthcare providers

25  utilizing authorizations for release of health information signed by Plaintiff. (Exhibit

26  B). The releases of information and the corresponding fax transmission records

27  demonstrate that neither Mr. Galicia nor anyone else refused to accept releases of

28  information on July 1, 2016, or at any other time. The releases of information

Plaintiff signed on July 1, 2016, were faxed to those providers on or shortly after July, 1, 2016. For example, the signed releases of information were faxed to St. Rose Dominican Hospital, Henderson Detention Center, Dr. Mashhood on July 1, 2016, the same day Mr. Galicia is alleged to have refused to accept them.  (Exhibit B, pp. 391-409).

There is no reliable evidence Mr. Galicia refused to accept Plaintiff's release of information forms in retaliation for a lawsuit. In fact, the evidence shows the forms were accepted from Plaintiff and sent to the various healthcare providers on or shortly after July 1, 2016.

      **ii.**    **Any Injury Caused by the Alleged Five Day Delay in Processing the Release of Information Forms Is De Minimus.**

The Prison Litigation Reform Act ("PLRA") provides that "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e).  This provision "requir[es] a less-than-significant-but-more-than-de minimis physical injury as a predicate to allegations of emotional injury." *Mitchell v. Horn*, 318 F.3d 523, 536 (3d 7 Cir. 2003).

The Ninth Circuit has determined that the "physical injury" requirement of 42 U.S.C. § 1997e(e) demands a showing of a "physical injury that need not be significant but must be more than de minimis" before a prisoner may recover damages for emotional injuries. *Oliver v. Keller*, 289 F.3d 623, 627 (9th Cir. 2002).

In this case, Plaintiff testified that Mr. Galicia's alleged refusal to accept the releases of information delayed Plaintiff's care by five days:

> Q     And what injuries do you believe that you suffered as a result of Arthur's actions?
>
> A     Which actions?
>
> Q     Any and all.
>
> A     Well, with respect to him rejecting my ROIs because I was suing the county, the injury that

**NAPHCARE DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT**    -22-

I suffered there was it prolonged my treatment because it had an adverse impact on my medical treatment, because had he faxed the ROIs that I gave him that -- had he faxed the ROIs that he rejected on that day, Williamson would have obtained my California records and my whole history, and that would have expedited my care and·cut down on the suffering, the reinfection in my·wrist.· It would have substantiated my wrist brace need, my eyeglasses need.· It would have showed Williamson that I had been trialed on all those prior NSAIDs, and that they were deemed to be·ineffective.· It would have cut down on Williamson's prescription of medications that I·was actually allergic to.· Like Tegretol, he prescribed Tegretol; I was allergic to it.· But I'm allergic to so many meds, I don't know all the names of them, but my California file lists these as allergies.

...

Q    I'm sorry.· What was the delay in the time between when Arthur took the ROIs from you·and Horace came and got them?· How much time are we talking?

A    The amount of time.· So Arthur rejected them I think -- I think it was June -- July 30th·or something like that.· I don't want to guess.

Q    So we're talking about a month?· Or less?

A    No.· It was from the point that Arthur·rejected them until Horace Tadeo came and got·them.· It was a matter of five days.· Under a·week.

(Exhibit E, 128:19- 129:19 and 130:17-131:4)

A five day delay in the processing of the releases of information falls far short of the physical injury required by 42 U.S.C. § 1997e(e).  As of July 1, 2016, Plaintiff had been incarcerated at CCDC for over five months. There is no indication and alleged delay of any duration caused or contributed to Plaintiff's injuries. Plaintiff did not suffer any acute medical problem between July 1, 2016 and July 6, 2016. Any injury Plaintiff might have suffered for the short alleged delay would be far too speculative to prove, or for recovery as limited by the PRLA.

///

**NAPHCARE DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT**                                                                -23-

**B.** **Plaintiff Fails to Present Evidence to Support His Deliberate Indifference to Serious Medical Needs Claims.**

**i.** **Standard to Establish Deliberate Indifference to Serious Medical Needs.**

"[T]o show deliberate indifference, the plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to the plaintiff's health." *Hamby v. Hammond*, 821 F.3d 1085 at 1092 (9th Cir. 2016) (internal quotation marks and citation omitted). "Deliberate indifference is a high legal standard. A showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment" *Id*. (internal quotation marks and citation omitted).

"A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin* v. Smith, 974 F.2d 1050 at 1059 (9th Cir. 1992). The court should consider whether a reasonable doctor would think that the condition is worthy of comment, whether the condition significantly affects the prisoner's daily activities, and whether the condition is chronic and accompanied by substantial pain. See *Lopez v. Smith*, 203 F.3d 1122 at 1131–32 (9th Cir. 1992). "[C]laims for violations of the right to adequate medical care brought by pretrial detainees against individual defendants under the Fourteenth Amendment must be evaluated under an objective deliberate indifference standard." *Gordon v. Cty. of Orange*, 888 F.3d 1118 at 1122–25 (9th Cir. 2018).

Isolated occurrences of neglect do not constitute deliberate indifference to serious medical needs. See *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). Even gross negligence is insufficient to establish deliberate indifference to serious medical needs. See *Toguchi v. Chung*, 391 F.3d 1051 at 1060.

A difference of opinion between the physician and the prisoner concerning the appropriate course of treatment does not amount to deliberate indifference to

1   serious medical needs.  See *Hamby v. Hammond*, 821 F.3d 1085 at 1092 ("Eighth

2   Amendment doctrine makes clear that '[a] difference of opinion between a

3   physician and the prisoner—or between medical professionals—concerning what

4   medical care is appropriate does not amount to deliberate indifference.'") (Internal

5   citations omitted.) Rather, the plaintiff must show the course of treatment was

6   medically unacceptable, in conscious disregard of an excessive risk to the

7   plaintiff's health. (*Id*.)

8       **ii.    Plaintiff's Allegations**.

9       In the FAC, Plaintiff alleges Defendants ignored his various injuries, pain

10  needs, seizures, etc. by prescribing him ibuprofen which was ineffective and

11  assigning him to a top bunk. Plaintiff alleges Defendants ignored his injuries related

12  to his seizure attacks and asthma attack. Plaintiff alleges, after multiple seizures

13  and seizure-related injuries, Defendants waited eight months before assigning

14  Plaintiff to a lower bunk despite Plaintiff's multiple requests. Finally, Plaintiff alleges

15  he was denied his medically-necessary wrist brace and eyeglasses.  None of

16  Plaintiff's allegations are true. Further, the allegations sound of medical

17  malpractice, not deliberate indifference to serious medical needs.

18      The fact that Plaintiff's allegations sound of medical malpractice, and do not

19  rise to the level of deliberate indifference to serious medical needs, is illustrated

20  by Plaintiff's response to NaphCare's discovery requests. Plaintiff was asked to

21  identify each incident which he contends violated his civil or constitutional rights.

22  In response, he provided a **19 page narrative** which summarized the care he

23  received at CCDC. (Exhibit F, pp. 18-35). Much of the narrative simply repeated the

24  factual summary included in NaphCare Defendants' previously filed motion for

25  summary judgment.

26      It is clear from Plaintiff's 19 page narrative that he is not contending some

27  specific malicious or reckless actions by any defendant healthcare provider

28  constituted deliberate indifference to his serious medical needs. Rather, Plaintiff

**NAPHCARE DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY**
**JUDGMENT**                                                                                    -25-

is actually contending the care and treatment he received was not appropriate and did not meet the standard of care.

### iii. The Records from NaphCare Establish Plaintiff Received Appropriate and Objectively Reasonable Care.

Plaintiff's allegations that Defendants ignored his various medical problems is simply incorrect. As described in detail above, Plaintiff frequently received medical care for the his complaints. He was seen on dozens of occasions when he was incarcerated at CCDC. He was evaluated and treated based on his complaints, the objective evidence, and his prior medical history.

Plaintiff's history of seizures was noted upon intake, on February 3, 2016. At that point, he was assigned a lower bunk. (Exhibit A p. 1). He remained assigned to a lower bunk through the time the TAC was filed. (Id). In addition, he was prescribed Keppra (Levetiracetam), an anticonvulsant, on the day he was booked into CCDC. (Exhibit A. P. 8).

Plaintiff's seizure attacks and asthma attacks were not ignored. Plaintiff was regularly seen for chronic care visits for both complaints. (Exhibit A pp. pp. 28-141). He was offered breathing treatments for asthma. (Exhibit A p. 12). Further, when Plaintiff requested an albuterol inhaler on April 22, 2016, Dr. Williamson prescribed one the same day. (Exhibit A pp. 7 and 12).

Plaintiff's complaint regarding a need for a wrist brace was investigated by Dr. Williamson. (Exhibit A pp. 31- 37). He evaluated Plaintiff on multiple occasions and did not see any indication for prescribing the brace.  Dr. Williamson made multiple efforts to obtain Plaintiff's medical records from UC Davis Medical Center, to determine whether a specialist had prescribed an orthopedic brace, and why. (Exhibit A pp. 31- 37).

Plaintiff's main contention regarding his healthcare appears to be the fact that he was not prescribed opiates for pain management. Dr. Williamson evaluated Plaintiff on many occasions for his complaints of pain. -Dr. Williamson did not see

NAPHCARE DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT                                                                                            -26-

any objective evidence of pain, and suspected Plaintiff had abused the opioids he had been prescribed in the past due to the fact he refilled his prescription early and his explanation for the early refill was "We ran out of the medications." (Exhibit A, pp. 20-23). Dr. Williamson exercised his medical judgment and prescribed a variety of non-opioid pain medications, which Plaintiff often refused to take. (See, for example, Exhibit A pp. 331-332). As noted in the attached report by Dr. Grant Nugent, Defendants' retained correctional healthcare expert, current recommendations from the Centers for Disease Control state opioids should not be first-line treatment for chronic pain. (Exhibit D to Declaration of Chad Couchot). In addition to receiving various types of treatment for his pain complaints by Dr. Williamson, Plaintiff was evaluated by Dr. Duran. Dr. Duran also concluded non-opioid treatment was appropriate. (Exhibit A, pp. 19-20).

Finally, Plaintiff claims he was denied eyeglasses. Plaintiff filed many medical requests and grievances. Only one request/grievance mentioned eye glasses. (Exhibit A p. 484). The request/grievance, dated May 13, 2016, primarily addressed plaintiff's complaints of pain and Dr. William's alleged "no narcotics policy." (*Id*.) Isolated occurrences of neglect do not constitute deliberate indifference to serious medical needs. See *Jett*, 439 F.3d at 1096. Accordingly, a single request for eyeglasses is not a basis to prove deliberate indifference to serious medical needs.

### iv. Plaintiff's Deposition Testimony Establishes There Was No Deliberate Indifference to Serious Medical Needs.

Plaintiff's deposition testimony establishes the alleged delay in diagnosis and treatment was not due to deliberate indifference. Plaintiff testified that Dr. Williamson provided the appropriate care and treatment, after he obtained plaintiff's prior medical records to confirm his medical history:

> Q    Yeah, and so -- because it's your belief that the problems with Dr. Williamson's care was·that he didn't have these prior records, and if he had these prior records to confirm it, your care

1   would have been fine; true?

2   A    He -- that was -- that's some of my – that's some
3        of my, yeah, that's some of my position, but the
     records were -- some of the ·records were
4        available.· They were available.

     Q    Okay.· But Dr. Williamson would have
5        prescribed the prescriptions and the medical
6        devices you needed if he had had that
     information from the prior providers; true?

7   A    In a timely fashion, yeah.

8   Q    Yeah.
     (Exhibit E, 129:19-130:8)

9
10       Plaintiff's deposition testimony establishes Dr. Williamson did not act with

11   deliberate indifference. Once he had objective information establishing Plaintiff's

12   medical needs, he provided the indicated care. That is not the type of malicious

13   or reckless conduct required to establish deliberate indifference to serious medical

14   needs.

**C.    Plaintiff Fails to Present Evidence to Support His Fourteenth
     Amendment Due Process Claim.**

16       The Fourteenth Amendment's Due Process Clause prohibits jail and prison

17   officials from "punishing" a pretrial detainee without a due process hearing.

18   *Mitchell v. Dupnik*, 75 F.3d 517, 524 (9th Cir. 1996). In the Screening Order, the

19   Court found that Plaintiff had stated sufficient allegations to implicate a due

20   process violation based on the policy of placing critically-injured inmates in hard

21   cells.

22       There is no NaphCare policy of placing critically-injured inmates in hard

23   cells without bedding. (Declaration of Melody Molinaro ¶ 2). There is no policy at

24   CCDC of placing critically-injured inmates in hard cells without bedding. (*Id* at. ¶

25   3).   Plaintiff cannot prove such a policy existed, because it did not. Notably,

26   Plaintiff's records are replete with complaints, requests, and grievances, but none

27   allege a deprivation of bedding. (Exhibit C).

28   ///

**NAPHCARE DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY
JUDGMENT**                                                    -28-

1   **D.   Plaintiff Fails to Present Evidence to Support His American with**
2   **Disabilities Act and Rehabilitation Act Claims.**

3       The Supreme Court has held that a prisoner may state an ADA claim based

4   on the "alleged deliberate refusal of prison officials to accommodate [a prisoner's]

5   disability-related needs in such fundamentals as mobility, hygiene, medical care,

6   and virtually all other prison programs." *United States v. Georgia*, 546 U.S. 151, 157

7   (2006). Courts apply the same analysis to claims brought under the ADA and RA.

8   *Zukle v. Regents of Univ. of California*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999).

9       Plaintiff alleges he had certain disabilities: right ear deafness, seizure

10  disorder, asthma disorder, PTSD, paranoid schizophrenia, Valley fever infection,

11  head trauma/concussion, neck and spinal sprain/trauma, left-wrist-mobility

12  impairment, bipolar condition, left-shoulder-mobility impairment, and a broken

13  right hand. (FAC at p. 120).  Plaintiff alleges Defendants denied him benefits of

14  services, programs, and/or activities by denying Plaintiff: a lower bunk, visits with

15  medical specialists, adequate pain management, left-hand brace, medication for

16  his left-hand cocci infection, and an asthma inhaler. (FAC at p. 124).

17      Defendants did not deny Plaintiff any medical care or accommodation for

18  any disability.  As described in detail above, all of Plaintiff's complaints were

19  evaluated and he was provided with all medically necessary treatment.  He was

20  assigned a lower bunk upon admission to CCDC. He was evaluated for his pain

21  complaints on many occasions, and he received a variety of medications, which

22  he often refused to take. Plaintiff requested an asthma inhaler on April 22, 2016,

23  and it was prescribed the same day.

24      Plaintiff's diagnosis of Valley fever was confirmed by the records from UC

25  Davis Medical Center received on August 22, 2016. (Exhibit A p. 181-183). On that

26  same day, he was prescribed Diflucan, the antifungal medication he had previously

27  taken for Valley fever. (Exhibit A p. 7). Dr. Williamson continued to monitor

28  Plaintiff's condition with laboratory tests, chest x-rays, and examinations.

1    Plaintiff was not denied any evaluations by medical specialists due to any

2    disability. Dr. Williamson repeatedly evaluated Plaintiff and considered whether

3    referrals to specialists were indicated. Based on his examinations of Plaintiff,

4    various test results, and his review of Plaintiff's prior medical records, Dr.

5    Williamson determined Plaintiff did not need to be referred to a pain management

6    specialist, aside from Dr. Duran, or any other type of specialist during the pertinent

7    time period.

8    **E.   All of the Care Plaintiff Received from Naphcare Was Within the
       Standard of Care.**

9

10    A defendant acts with deliberate indifference by treating, or declining to

11    treat, the Plaintiff in a manner that is "medically unacceptable under the

12    circumstances," and "in conscious disregard of an excessive risk to [the inmate]'s

13    health." *Rosati v. Igbinoso*, 791 F.3d 1037 at 1039 (quoting *Jackson v. McIntosh*, 90

14    F.3d 330, 332 (9th Cir. 1996)).

15    Dr. Nugent reviewed Plaintiff's medical records from CCDC to determine

16    whether the care Plaintiff received was within the standard of care. Dr. Nugent

17    began practicing medicine in 1967 and recently retired.  Before retiring, he was

18    the Medical Director of Correctional Health Services for the Sacramento County

19    Department of Health Services. As described in detail in Dr. Nugent's report all of

20    the care Plaintiff received during the pertinent time period underlying this lawsuit,

21    and beyond, was within the standard of care.  (Exhibit D).

22    **F.   NaphCare Did Not Cause Any Injury to Plaintiff.**

23    When a prisoner alleges that delay of medical treatment evinces deliberate

24    indifference, the prisoner must show that the delay led to further injury. See

25    *Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985)

26    (holding that "mere delay of surgery, without more, is insufficient to state a claim

27    of deliberate medical indifference").

28    Plaintiff was not caused any injury by Defendants' alleged delay or

**NAPHCARE DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY
JUDGMENT**                                                                -30-

1    depravation of medical treatment.  As described above and in Dr. Nugent's report,

2    the Plaintiff was evaluated for all of his complaints in a timely manner, and he

3    received the care and treatment which was indicated.  After reviewing Plaintiff's

4    medical records from NaphCare, and the various providers from which NaphCare

5    obtained additional records, Dr. Nugent concluded no act or omission by

6    Defendants caused an injury to Plaintiff. (Exhibit D). Plaintiff cannot prove

7    otherwise.

8                          **VI.   CONCLUSION**

9          The claims against the LPN defendants are barred by the statute of

10   limitations. The  amendment of the complaint naming them as defendants does

11   not relate back to the date of the original complaint, and the LPN defendants

12   should be dismissed.

13         Plaintiff's allegations sound of medical malpractice, not of deliberate

14   indifference to serious medical needs. The failure to provide Plaintiff with the

15   specific type of care he requests does not constitute deliberate indifference to

16   serious medical needs. It is clear that the care Plaintiff received was directed by

17   the objective information Dr. Williamson had, and not by any malicious intent or

18   recklessness.

19         Plaintiff's claims are not supported by any competent evidence. Further,

20   Defendants' care has been reviewed by a well-qualified expert, who determined

21   the care was within the standard of care. Finally, no act or omission by Defendants

22   caused any injury to Plaintiff.

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

**NAPHCARE DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY**
**JUDGMENT**                                                              -31-

1    The unsubstantiated allegations in the FAC are insufficient to defeat

2    summary judgment. Based on the foregoing facts and arguments, the Court should

3    grant Defendants' Motion for Summary Judgment as to all of Plaintiff's claims.

4    Dated:        April 2, 2020

5                                          SCHUERING ZIMMERMAN & DOYLE, LLP

6

7                                          By   /s/ Chad C. Couchot
                                                CHAD C. COUCHOT
8                                               Attorneys for Defendants
                                                NAPHCARE, INC., LARRY
9                                               WILLIAMSON, M.D., ARTHUR
                                                GALICIA, ELIZABETH AKHTAR,
10                                              ELIZABETH ACEVEDO, DEBORAH
                                                CANTO, DEBRA VANDERWAAG,
11                                              REMIELYN MANDING, FREDERICK
                                                LAITA, ROCHELE PEOPLES,
12                                              LAWANDA MCCLAIN, MICHELLE
                                                GONZALEZ, MARIAN MURRIEL,
13                                              MARINA ALBERTO, MESTAWOTE
                                                WILLIAMS, HORACE TADEO,
14                                              AMANDA VERTNER, AND
                                                CRYSTAL GONZALEZ
15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NAPHCARE DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT**                                                      -32-